UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **CHARLES SIMMONS,** | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 21-cv-1077 (APM) |
| **TEXTRON, INC. et al.,** | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.    INTRODUCTION**

On October 2, 2018, Plaintiff Charles Simmons suffered severe injuries after crashing a Cushman Minute Miser 3-wheeled electric utility vehicle (the "Vehicle") at the Walter E. Washington Convention Center in Washington, D.C. Simmons filed this suit against the manufacturers of the Vehicle, Textron, Inc. and Textron Specialized Vehicles, Inc.[1] Plaintiff asserts two tort claims: a manufacturing defect claim and a design defect claim. Now before the court is Defendants' motion for summary judgment. The parties also have filed dueling *Daubert* motions seeking to exclude the other's experts.

For the reasons explained below, the court grants in part and denies in part Defendants' motion for summary judgment and denies without prejudice the parties' *Daubert* motions. Plaintiff's manufacturing defect claim may proceed to trial, but his design defect claim cannot.

---

[1] Plaintiff initially brought suit against two additional defendants, United Rentals (North America), Inc. and United Rentals, Inc. *See* Compl., ECF No. 1. Plaintiff voluntarily dismissed United Rentals, Inc. as a defendant in May 2021. *See* Pl.'s Notice of Voluntary Dismissal, ECF No. 3. On, September 11, 2023, this court granted via Minute Order United Rentals (North America), Inc.'s uncontested Motion for Summary Judgment and entered judgment in its favor.

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine dispute" of a "material fact" exists when the fact is "capable of affecting the substantive outcome of the litigation" and "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elzeneiny v. Dist. of Columbia*, 125 F.Supp.3d 18, 28 (D.D.C. 2015) (citations omitted).

In assessing a motion for summary judgment, the "court considers all relevant evidence presented by [the parties]." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008) (citations omitted). The court looks at the facts in the light most favorable to the nonmoving party and draws all justifiable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). (1986) (citation omitted). If the court determines "no reasonable jury could reach a verdict in [non-movant's] favor," then summary judgment is appropriate. *Wheeler v. Georgetown University Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016) (citation omitted). Courts are "not to make credibility determinations or weigh the evidence." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (citation omitted).

## III.   DISCUSSION

### A.   Motion for Summary Judgment

The court first addresses Plaintiff's manufacturing defect claim before turning to his claim of design defect.

       *1.*      *Manufacturing Defect*

          a.      <u>Background Facts</u>

Let's start with the facts. On October 2, 2018, Plaintiff and his colleague, Mike, were working at the Convention Center directing trucks entering two different gates. Mem. of P&A in Supp. of Defs.' Mot. for Summ. J., ECF No. 51-1 [hereinafter Defs.' Mot.], Dep. Tr. of Charles Simmons, ECF No. 50-4 [hereinafter Simmons Dep.], at 45:1-14, 51:1. Plaintiff and Mike grew tired of walking between the gates, so they decided to "get carts" that would allow them to "ride back-and-forth to the gates." *Id*. at 51:11-19. They found multiple carts, including the Vehicle, at the top of a ramp parked in an open space. *Id.* at 140:1-13, 141:11-19. Plaintiff selected one of them, turned on the engine, and began driving down the ramp, which was approximately 135 feet in length and had a 90-degree turn at the bottom. Pl.'s Opp'n to Defs.' Mot., ECF No. 56 [hereinafter Pl.'s Opp'n], Pl.'s Stmt. of Genuine Issues of Material Fact, ECF No. 56-1 [hereinafter SOF[2]], ¶ 14.

As the Vehicle picked up speed, SOF ¶ 15, Plaintiff applied the brake and felt "nothing." Simmons Dep. at 150:18-21. The "pedal went all the way to the . . . bottom of the cart." *Id.* at 150:22–151:2. Plaintiff then tried repeatedly to engage the brakes ("tap, tap, tap," as he described it), but each time the pedal "came back up." *Id.* at 151:9–152:18. Plaintiff could not recall if the brake pedal ever just remained on the floor. *Id.* at 152:19-21. Unable to slow or stop the Vehicle, Plaintiff turned into a curb on the side of the ramp. SOF ¶ 16. The Vehicle hit the curb with such force that Plaintiff was thrown from the Vehicle, which then rolled onto him causing severe injuries. *Id.* ¶ 17.

---

[2] Unless otherwise noted, the court's citations to Plaintiff's responsive Statement of Facts are to undisputed facts.

The Vehicle's brake assembly rests at the heart of this case. The Vehicle's brake pedal (in green below) is attached to an L-bracket (in yellow) that is connected in turn to the brake bearing tube (in blue) by a circular weld around one side of the tube (at the point circled in the image below). SOF ¶ 35. The L-bracket is designed to be inserted onto and welded 360 degrees around the brake bearing tube on only one side of the L-bracket. SOF ¶ 39.



Defs.' Mem. in Supp. of their Mot. in Limine to Exclude Expert Testimony, ECF No. 52-1 [hereinafter Defs.' MIL], at 3, Diagram of Brake Components. When the brake pedal is depressed, it causes the brake bearing tube to rotate, which engages other parts of the brake assembly, decompressing a spring that creates tension on the assembly. SOF ¶ 36. When the force applied to the brake pedal is relieved, the spring recompresses, returning the brake assembly to its original position and raising the brake pedal. SOF ¶ 37. The image below illustrates how this works.



Defs.' Mot. at 9, Diagram of Complete Brake Assembly. A post-accident examination of the Vehicle showed significant damage to its front portion. SOF ¶ 23. As for the brake system, the examination showed that the brake pedal was resting on the floor of the vehicle, *id.* ¶ 21, and that the L-bracket was fractured from the brake bearing tube and exhibited lateral deformation, *id.* ¶¶ 22, 24.

    b.  <u>The Parties' Positions</u>

  The parties' dispute centers on whether the L-bracket detached either before or during Plaintiff's drive down the ramp or as a direct result of the Vehicle crashing into the curb. Defendants insist, based on Plaintiff's description of his efforts to stop the Vehicle and the design of the brake assembly, that the L-bracket could have broken off only from the force of the crash. They contend that "the connected brake pedal and L-Bracket are held up only by the brake bearing tube—such that if the weld connecting the L-Bracket to the brake bearing tube fails, the brake pedal would fall and could not return to its original upright position." SOF ¶ 38 (disputed by Plaintiff). Thus, "if the L-bracket had fractured *before* the Vehicle collided with the ramp," the

5

brake pedal could not have returned to an upright position. Defs.' Mot. at 17 (emphasis added). Because Plaintiff testified that the brake pedal returned to an upright position after he repeatedly pressed on it, "the L-Bracket . . . could not have failed *while* he drove down the ramp" and instead most likely failed upon impact with the curb. *Id*. (emphasis added). To think otherwise defies "the basic principles of gravity." *Id*. at 18.

Plaintiff disagrees with both the characterization of his testimony and the accuracy of Defendants' description of how the brake pedal necessarily functions if the L-bracket were to fracture from the brake bearing tube. SOF ¶¶ 22, 38. As to his testimony, Plaintiff states that his recollection of the brake pedal's position before the crash is "equivocal at best." Pl.'s Opp'n at 11. Recall that Plaintiff testified that initially he felt nothing when pushing on the brake pedal and it went to the bottom of the cart, but then the pedal returned to an upright position. *Id.* Plaintiff could not remember whether "the break [*sic*] pedal ever just stay[ed] on the floor." Simmons Dep. at 152:19-21. Plaintiff's apparent position is that his uncertainty raises a genuine dispute of material fact as to the pedal's position before the crash.

Moreover, Plaintiff challenges Defendants' core proposition that the brake pedal could not have risen after the brakes failed. For this they turn to expert evidence. One of Plaintiff's experts, Steven Becker, who is a mechanical engineer and accident reconstructionist, wrote in his report that "[t]he fractured brake arm and lack of brakes caused Simmons' incident per his testimony, and there is no evidence that contradicts his account." Pl.'s Opp'n, Investigation of the Charles Simmons Incident, ECF No. 56-11 [hereinafter Becker Report], at 12.[3] At his deposition, Becker testified as to how the brake assembly could have come apart with the brake pedal still returning

---

[3] As discussed below, the court denies Defendants' motion to exclude Plaintiff's experts, so the court appropriately considers Plaintiff's expert evidence.

to an upright position.  Becker explained that the fracture of the "ligaments" on the L-bracket would not necessarily disconnect the L-shaped bracket from the brake bearing tube, and as long as the components remained interfaced, the pedal could rise back up at least until the moment the two components separated entirely.  Pl.'s Opp'n, Dep. Tr. of Steven Becker, ECF No. 56-9 [hereinafter Becker Dep.], at 196:3–197:21.

Plaintiff's other expert, Craig Clauser, a metallurgist, provided additional evidence. Clauser, who inspected the brake assembly after the accident, wrote in his report that "details of fractures are entirely consistent with being caused by loading to the brake pedal," that is, the force created by stepping on the brake pedal.  Pl.'s Opp'n, Expert Report of Craig Clauser, ECF No. 56-10 [hereinafter Clauser Report] at 3.  He opined that the fracture of the L-bracket was consistent with "tensile overload."  *Id*. at 2.  The lack of "resolidified weld microstructures" confirms that "the weld failed to melt and fuse with the arm plate," and the "defective weld which failed to effectively join this portion of the arm to the shaft reduced the load carrying capacity of the connection to a level where a 100–150 pound force on the pedal could cause failure of the connection."  *Id.* at 2–3.  He made these determinations based on a "metallurgical failure analysis" that he personally performed.  *Id.* at 1.

c.  Analysis

The court turns now to the applicable legal framework as applied to Plaintiff's claim. A product "contains a manufacturing defect when [it] departs from its intended design." Restatement (Third) of Torts: Prod. Liab., § 2 (1998).  The D.C. Circuit has recognized two types of manufacturing defect claims arising under District of Columbia law: "specific defects" and "general defects."  *Siegel v. Mazda Motor Corp.*, 835 F.2d 1475, 1477–79 (D.C. Cir. 1987); *McFarlane v. Caterpillar, Inc.*, 974 F.2d 176, 179 (D.C. Cir. 1992); *see also Pappas v. Ford Motor*

7

*Co.*, 7 F. Supp. 2d 22, 26 (D.D.C. 1998). A "specific defect" claim is "that a specific, identifiable part of the [product] was defective and was the cause of the accident." *Pappas*, 7 F. Supp. at 26. A "general defect" claim, or "more accurately . . . an unspecified defect," is premised on the finder of fact inferring a defect "from the accident itself." *Id* (citation omitted).

Although the parties do not specify the type of defect claim at issue, it is apparent that Plaintiff relies on a theory of "specific defect": the improperly fused weld connecting two crucial components of the brake assembly. To succeed on this claim, Plaintiff must introduce evidence that is "significantly probative" of Defendants' liability. *McFarlane*, 974 F.2d at 179. Such proof often comes by way of expert testimony. *See Pappas*, 7 F. Supp. 2d at 26.

Plaintiff has presented such evidence here, creating a genuine dispute of material fact as to the cause of the accident. Plaintiff proffers two experts who will say that it was mechanically possible that the brake assembly failed *and*, consistent with Plaintiff's own testimony, the brake pedal was *capable* of remaining upright during a failure of the kind that allegedly occurred here.[4] Becker testified that it was possible that the L-bracket and brake bearing tube remained interfaced for a time before fully detaching. In his view, this would allow the brake pedal to remain upright while the brake itself would not function. Similarly, Clauser opined that the fractures were consistent with loading to the brake pedal, rather than from the external impact.

Defendants respond that the court should give these opinions no weight. Becker's opinion, they say, is speculative and contradicts Plaintiff's testimony. Becker could not rule out that the

---

[4] The other possibility is that the brake pedal in fact fell to the floor before the crash, consistent with Defendants' understanding of what would happen if the components had disconnected, but Plaintiff did not so testify. He could not recall if that had occurred. Simmons Dep. at 152:19-21. Plaintiff's lack of memory cannot create a genuine dispute of material fact. *See FEC v. Toledano*, 317 F.3d 939, 950 (9th Cir. 2002) ("[F]ailure to remember and lack of knowledge are not sufficient to create a genuine dispute."); *FDIC v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 205 F.3d 66, 75 (2d Cir. 2000) ("[V]ague denials and memory lapses . . . do not create genuine issues of material fact.").

collision separated the two parts, and he could not identify when exactly the brakes failed. Defs.' Mot. at 11–12. Clauser's opinion suffers from similar shortcomings, as it does not account for Plaintiff's testimony, does not rule out that the collision could have fractured the parts, and is otherwise reliant on speculation. *Id*. at 13–14.

These are arguments for a jury, not a dispute that the court can properly resolve on summary judgment. *See Ambrosini v. Labarraque*, 966 F.2d 1464, 1469 (D.C. Cir. 1992) ("When a court denies the right to have a jury decide a disputed issue, especially one of a scientific nature, its reasons for doing so must be strong.") (citation omitted). To be sure, an expert's opinion cannot rest on speculation. *See, e.g., United States ex rel. Morsell v. NortonLifeLock, Inc.*, 567 F. Supp. 3d 248, 259 (D.D.C. 2021) (stating that expert testimony "that rests solely on subjective belief or unsupported speculation" is not reliable) (internal quotation marks and citation omitted). But Plaintiff's experts' opinions are not speculative. They are the product of what experts do: apply their knowledge and experience to the objective facts. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993) (stating that Rule 702's allowance of an exception to the usual rule requiring firsthand knowledge or observation "is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline"). Becker, for instance, explained why, based upon his observation that the brake arm's steel was deformed, the brake pedal could have remained upright, even while the arm fractured. Becker Dep. at 196:3–197:21. Clauser conducted an actual metallurgical analysis in a laboratory to reach his opinions. Clauser Report at 1. It will be up to a jury to decide whether these opinions hold up to scrutiny. This case presents a "classic battle of the experts, a battle in which the jury must decide the victor." *Ferebee v. Chevron Chem. Co.*, 736 F.2d 1529, 1535 (D.C. Cir. 1984) (citation omitted).

Before moving on, the court must address Defendants' contention that Plaintiff must negate all reasonable alternative explanations to prevail on his manufacturing defect claim. *See* Defs.' Reply in Supp. of Defs.' Mot., ECF No. 59, [hereinafter Defs.' Reply] at 4–5. In support for that proposition, Defendants look to *McFarlane*, 974 F.2d at 180, and *Corcoran v. General Motors Corp.*, 81 F. Supp. 2d 55, 66 (D.D.C. 2000). But their reliance on those cases is misplaced. The portions Defendants cite articulate the standard for proving a *general* defect claim, not one as here premised on a *specific* defect. *See McFarlane*, 974 F.2d at 180 (laying out the standard "to prove a general defect"); *Corcoran*, 81 F. Supp. 2d at 66, 69 (elaborating on how a plaintiff could succeed on a "general defect theory" where the plaintiff's failure to proffer an expert precluded him from proceeding on a specific defect theory). As discussed, to prove a specific defect, a plaintiff must come forward with evidence that is "significantly probative" of Defendants' liability, usually based on expert evidence. *See McFarlane*, 974 F.2d at 179; *Pappas*, 7 F. Supp. 2d at 26. Plaintiff has done so here.

    2.  *Design Defect*

The court reaches a different conclusion, however, as to Plaintiff's design defect claim. Under District of Columbia law, a strict-liability design defect claim requires showing, among other things, that the product was "sold in a defective condition unreasonably dangerous to the consumer or user." *Ferguson v. F.R. Winkler GMBH & Co. KG*, 79 F.3d 1221, 1224 (D.C. Cir. 1996) (citing *Warner Fruehauf Trailer Co. v. Boston,* 654 A.2d 1272, 1274 (D.C. 1995)). To establish that "a design defect was unreasonably dangerous . . . a plaintiff 'must show the risks, costs and benefits of the product in question and alternative designs, and that the magnitude of the danger from the product outweighed the costs of avoiding the danger.'" *Rogers v. Ingersoll-Rand*

*Co.*, 144 F.3d 841, 843 (D.C. Cir. 1998) (citation omitted); *see also Hull v. Eaton Corp.*, 825 F.2d 448, 454 (D.C. Cir. 1987).

The purported design defect that Plaintiff identifies is that the connection point of the brake bearing tube and the L-bracket is welded together on one side only, rather than both. According to his expert Becker, "a reasonably feasible alternative design to the brake arm assembly could have been with two welds (both sides of the joint), which would have been at least twice as strong and less susceptible to fracture by design." Becker Report at 16. The failure to implement this "[r]edundancy," Becker asserts, caused the Vehicle to be "defective and unreasonably dangerous." *Id.*

Plaintiff fails to carry its burden with this expert testimony for two reasons. First, Plaintiff's expert *admitted* that, as designed with a single weld, the Vehicle's brake assembly was not dangerous. Becker agreed that "[i]f the weld was done correctly, . . . this [Vehicle] was designed to handle the forces that are created by the braking in this case." Becker Dep. at 174:1-5. Plaintiff vigorously denies that this is a concession, Pl.'s Opp'n at 14, but does not explain how it can be understood as anything else. Becker may be correct that a weld on both sides would be superior to a weld on one, but the question is not whether Defendants adopted the safest possible design, but whether the actual design was unreasonably dangerous. *Westinghouse Elec. Corp. v. Nutt*, 407 A.2d 606, 611 (D.C. 1979) ("It is one thing to show that the defendant might have designed a safer product; quite another to show that the product he did design was unreasonably dangerous. The defendant is not obliged to design the safest possible product . . . so long as the design he has adopted is reasonably safe.") (citation omitted). Becker testified that it was not.

Second, Plaintiff does not offer sufficient evidence that would allow a trier of fact to perform a "risk-utility test" to determine the reasonableness of the single-weld design. Other than

11

the alternative design itself, Plaintiff fails to offer any "other information that could assist in assessing whether or not it was unreasonable for" Defendants to "put the [Vehicle in] the stream of commerce" as designed. *Nationwide Mut. Fire Ins. Co. v. Broan-Nutone, LLC*, No. 20-cv-678 (BAH), 2022 WL 4547948, at *7 (D.D.C. Aug. 19, 2022); *see also Webster v. Pacesetter, Inc.*, 259 F. Supp. 2d 27, 33 (D.D.C. 2003) (finding that the plaintiffs "failed to sustain their burden under the risk-utility balancing test" where, among other deficiencies, "they have not provided any information about the cost of avoiding any supposed danger").

Plaintiff's alternative design theory also relies on Clauser's finding that the lack of fusion rendered the connection 10 times weaker than when fully welded, thus "implementation of a redundant weld would be to maximize the strength of the weld, at more than 10-times the strength of the failed weld." Pl.'s Opp'n at 15. But the Vehicle's design does not call for a failed weld or a lack of fusion, it calls for a fully secured weld on one side. SOF ¶ 35. Plaintiff has not shown that *that* design was unreasonably dangerous.

Finally, Defendants point to the fact that an ignition key was permanently affixed to the Vehicle, which they suggest is a "critical modification" of the Vehicle's "safety design." Defs.' Reply at 12. Thus, they argue, Plaintiff cannot show that the Vehicle reached the end user "without any substantial change from the condition in which it was sold." *Ferguson*, 79 F.3d at 1224. The court need not reach this issue because Plaintiff has failed to establish a different essential element of a design defect claim, *i.e.*, that the brake assembly as designed was unreasonably dangerous.

    3.    *Misuse Defenses*

Defendants assert a host of defenses that the court collects under the umbrella of "product misuse." Defs.' Mot. at 22–25. Among them are: (1) Plaintiff violated the law by driving the

Vehicle without a license; (2) Plaintiff unlawfully drove the Vehicle without authorization; (3) the Vehicle had a key attached to it that facilitated Plaintiff's unauthorized use; and (4) Plaintiff ignored warnings "placarded on the Vehicle and in the owner's manual," including that the "Vehicle should only be operated by a trained operator with a valid driver's license" and the operator should "complete a brake performance test before operating the Vehicle," in the manner specified in the owner's manual. *Id.* Defendants argue they cannot be held liable because the "*cause of the accident* was a product of misuse, not any defect in the weld securing the L-Bracket to the brake arm assembly." *Id.* at 25 (emphasis added). Defendants thus treat product misuse as dispositive on the element of causation.

Defendants' presentation of these product misuse defenses is imprecise. They treat them as the *actual* cause of the Vehicle's crash to the exclusion of any manufacturing defect. But if a specific defect in the weld did not cause the accident, then these product misuse defenses are of no moment. If there is no specific defect, there is no liability. The product misuse defenses matter only if the trier of fact were to find that there was a specific defect.

The question then becomes whether the specific defect was a "proximate cause" of the injury. *Payne v. Soft Sheen Prods., Inc.*, 486 A.2d 712, 726 (D.C. 1985); *see also McNeal v. Hi-Lo Powered Scaffolding, Inc.*, 836 F.2d 637, 644 (D.C. Cir. 1988) (stating that "proximate cause" is the "next inquiry" after determining that warnings were inadequate). Under District of Columbia law, "[p]roximate cause encompasses both foreseeability of injury, and the decision that liability will not attach unless the breach of duty has a substantial and direct causal link to the plaintiff's injury." *Dist. of Columbia v. Freeman*, 477 A.2d 713, 716 (D.C. 1984) (citations omitted). "A plaintiff must introduce evidence which affords a reasonable basis for the belief that it is more likely than not that the conduct of the defendant was a *substantial* factor in bringing about the harm

13

at issue." *McNeal*, 836 F.2d at 644 (citing *Lacy v. Dist. of Columbia*, 424 A.2d 317, 318 (D.C. 1980) (emphasis in original) (cleaned up).

Even if there is some additional causal factor—like product misuse—a defendant is not necessarily off the hook. "The manufacturer's action need not be the sole proximate cause of the injury: the manufacturer may still be held liable even though other causes proximately contributed to the injury." *Payne*, 486 A.2d at 726. "The question is whether the manufacturer's action was a proximate rather than a remote cause, and test of proximate causation . . . is whether the result was reasonably foreseeable." *Id.* "[W]here harmful consequences are brought about by intervening, independent forces . . . whose operation could have been foreseen, the chain of causation extending from the original act . . . is treated as a proximate cause." *Id.* (citation omitted); *see also McNeal*, 836 F.2d at 646 (D.C. Cir. 1988) (quoting *Payne*, 486 A.2d at 726). In other words, as applied here, a reasonably foreseeable product misuse would not absolve Defendants of liability, even if it contributed to the crash.

Importantly, under District of Columbia law, whether the manufacturer's action, or some other, is a proximate cause of a plaintiff's injuries "is a jury question and should not [be] decided as a matter of law by the trial court." *Payne*, 486 A.2d at 726; *see also McNeal*, 836 F.2d at 644 ("In most cases, the existence of proximate cause is a question of fact for the jury.") (internal quotation marks and citation omitted); *Dist. of Columbia v. Carlson*, 793 A.2d 1285, 1291 (D.C. 2002) ("[F]oreseeability . . . is 'nearly always' a question of fact for the jury.") (citation omitted).

Put within this proper frame, Defendants' product misuse defenses are fundamentally fact questions and, for that reason alone, the court cannot grant Defendants judgment on any of those grounds. Defendants certainly have not established that any of the alleged misuses—individually

or taken together—were the sole cause of Plaintiff's injuries. Nor have they conclusively shown that the misuses were unforeseeable. It will be for a jury to decide whether Plaintiff's driving without a license (perhaps in violation of D.C. law),[5] lack of proper training, his unauthorized use of the Vehicle (also perhaps in violation of D.C. law, *see n.* 5 *supra*), the attachment of a key to the Vehicle to facilitate its unauthorized use, or his failure to abide by warnings before driving it were not reasonably foreseeable and therefore decisively broke the causal chain, thereby relieving Defendants of liability.

### B.   *Daubert* Motions

#### 1.   *Defendants' Motion*

The court turns now to the parties' *Daubert* motions, starting with Defendants. Defendants move to exclude the testimony of both of Plaintiff's experts. *See generally* Defs.' MIL. Defendants make two principal arguments: (1) the experts' opinions as to causation are speculative and contradicted by Plaintiff's testimony and other evidence, and (2) Becker's design defect and inspection opinions are speculative and contradicted by his own testimony. Defs.' MIL at 4–9. Because the court grants summary judgment as to the design defect claim, the court considers only the first argument.

Courts must proceed "cautious[ly]" when deciding whether to exclude expert testimony at the summary judgment stage. *Carmichael v. West*, No. 12-cv-1969, 2015 WL 10568893, at *7 (D.D.C. Aug. 31, 2015) (citation omitted). "Because the summary judgment process does not conform well to the discipline that *Daubert* imposes, the *Daubert* regime should be employed only

---

[5] Plaintiff disputes that the Vehicle qualifies as a motor vehicle under either the District's unauthorized use of a motor vehicle criminal statute, D.C. Code § 22-3215, or its driving without a license statute, D.C. Code § 50-1401.01, the two laws relied upon by Defendants. Pl.'s Opp'n at 20. The court does not need to resolve this question now because, even if Defendants are correct, whether such law violation was foreseeable is a question for the jury. Whether Defendants can present such defenses to the jury can be resolved pretrial by a motion in limine.

15

with great care and circumspection at the summary judgment stage." *Cortes–Irizarry v. Corporacion Insular de Seguros*, 111 F.3d 184, 188 (1st Cir. 1997). *Daubert* is "accessible" at the summary judgment stage, but "courts must be cautious—except when defects are obvious on the face of a proffer—not to exclude debatable scientific evidence without affording the proponent of the evidence adequate opportunity to defend its admissibility." *Id.* (citation omitted).

Here, the primary thrust of Defendants' argument is that the experts' opinions are fatally flawed because they are irreconcilable with Plaintiff's testimony that he pumped the brakes repeatedly and still the brake pedal rose to its original position. Their opinions therefore must be excluded. This argument fails for two reasons.

First, both experts expressly considered Plaintiff's testimony when offering their expert opinions. Clauser Report at 1; Becker Report at 4. "It is not as if the Report[s] fail[ed] to consider [this] relevant evidence." *Paige Int'l, Inc. v. XL Specialty Ins. Co.*, No. 14-cv-1244 (JEB), 2016 WL 3024008, at *5 (D.D.C. May 25, 2016).

Second, neither expert's opinion runs afoul of *Daubert*'s requirements for admission, as neither is fatally inconsistent with Plaintiff's version of events. As discussed above, *see supra* Section II.A.1, Becker opined, after personally observing the Vehicle post-accident, that the positioning of rust and debris near the weld indicated "that it was poorly attached" and the "weld did not fuse together" the sections of the L-bracket with the tube; that "[n]one of the brake arm assembly components displayed evidence of external impact damage"; and that a "portion of the bracket remained attached to the tube." Becker Report at 11, 15. He further testified that fracture of the ligaments on the L-bracket would not necessarily disconnect the L-shaped bracket from the brake bearing tube and, as long as the components remained interfaced, the pedal could rise back up at least until the moment the two components separated entirely. Becker Dep. at 196:3–197:21.

These are not speculative opinions. They are based on Becker's substantial knowledge and experience and his review of the record evidence. The court will not exclude Becker's opinions "merely because [Defendants think that] the factual bases for [the] expert[s'] opinions are weak." *Joy v. Bell Helicopter Textron, Inc.,* 999 F.2d 549, 567 (D.C. Cir. 1993), *certified question answered sub nom. Allison Gas Turbine Div. of Gen. Motors Corp. v. Dist. of Columbia*, 642 A.2d 841 (D.C. 1994) (citation omitted).

As for Clauser, Defendants elected not to take his deposition, so he was never asked how his opinion was not fatally inconsistent with Plaintiff's testimony.

Defendants also challenge Plaintiff's experts on a secondary ground. They contend that the lateral deformation shown on the L-bracket post-accident is "inconsistent with brake loading," thereby undermining their opinions. Defs.' MIL at 5. Defendants argue that the experts allegedly "ignore" this lateral deformation, which Defendants contend *must* have occurred upon impact with the curb. *Id*. at 2.

The trouble once again is that there is a genuine disputed issue about what inference to draw from the lateral deformation. Becker explained in his testimony other ways in which the L-bracket could have deformed from brake loading, *see* Pl.'s Opp'n at 6–7, to which Defendants offer no response other than to disagree with the premise, *see* Defs.' MIL at 5 (citing Report of Dr. Robert Pond, ECF No. 52-6). As for Clauser, Plaintiff introduced a new declaration from him with his opposition brief, stating that the "lateral deformation is . . . consistent with and caused by the loading of the brake pedal . . . [and] not caused by the crash of the" Vehicle. Pl.'s Opp'n to Defs.' MIL, ECF No. 54 [hereinafter Pl.'s MIL Opp'n], Decl. of Craig Clauser, ECF No. 54-8 [hereinafter Clauser Decl.], ¶¶ 11–12; *see id.* ¶ 8 ("the details of the factures are entirely consistent with . . . loading of the brake pedal") (citing Clauser Report at 3). Defendants characterize this

17

declaration as "not timely" in violation of the requirements of Rule 26(a)(2)(B). Defs.' Reply in Supp. of Defs.' MIL, ECF No. 58 at 8–9. Yet, as noted, Defendants never took Clauser's deposition, Clauser Decl. ¶ 2, and did not introduce an expert to rebut his opinions, Pl.'s MIL Opp'n at 14. Far from "'lying in wait' to express new opinions at the last minute," Clauser merely elaborated on his original opinion in response to arguments raised in Defendants' motion to exclude. *Iacangelo v. Georgetown Univ.*, 272 F.R.D. 233, 234 (D.D.C. 2011) (citation omitted).

At bottom, Defendants' challenge to Plaintiff's experts is simply to disagree with the inferences they draw from the facts. To the extent Defendants believe that there is "a weak factual basis" for the experts' opinions, "that is appropriately challenged on cross examination." *Campbell v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 297 (D.D.C. 2018) (citing *Boyar v. Korean Air Lines Co.*, 954 F. Supp. 4, 7 (D.D.C. 1996)). The court therefore denies Defendants' *Daubert* motion without prejudice to its renewal before or at trial.

### 2. Plaintiff's Motion

Lastly, Plaintiff moves to exclude the opinions of Coleson Carmell, Defendants' expert. *See* Mem. of P&A in Supp. of Pl.'s Mot. to Exclude the Expert Ops. of Coleson Carmell, ECF No. 49-1. The court will deny the motion without prejudice as the court has not materially relied on Carmell's expert opinion in deciding Plaintiff's design defect claim in favor of Defendants. *See Zuk v. Washington Metro. Area Transit Auth.*, No. 23-CV-294 (JMC), 2025 WL 604976, at *2 n. 2 (D.D.C. Feb. 25, 2025). Again, like Defendants, Plaintiff may renew this motion before or at trial.

## IV. CONCLUSION AND ORDER

For the foregoing reasons, the court grants in part and denies Defendants' Motion for Summary Judgment, ECF No. 50. The court denies without prejudice Defendants' Motion in

Limine to Exclude Expert Testimony, ECF No. 52, and denies without prejudice Plaintiff's Motion to Exclude the Expert Opinions of Coleson Carmell, ECF No. 49. The motions for hearings in connection with the aforementioned motions are denied as moot, ECF No. 51, 53.

The parties shall appear for a remote status conference on April 4, 2025, at 9:30 a.m. to discuss the schedule for next steps in this matter.

Dated: March 24, 2025

Amit P. Mehta
United States District Judge